FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDREA SCHMITT, on her own
behalf, and on behalf of all similarly
situated individuals; ELIZABETH
MOHUNDRO, on her own behalf, and
on behalf of all similarly situated
individuals,

*Plaintiffs-Appellants*,

v.

KAISER FOUNDATION HEALTH PLAN
OF WASHINGTON; KAISER
FOUNDATION HEALTH PLAN OF THE
NORTHWEST; KAISER FOUNDATION
HEALTH PLAN, INC.,

*Defendants-Appellees.*

No. 18-35846

D.C. No.
2:17-cv-01611-
RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted November 8, 2019
Seattle, Washington

Filed July 14, 2020

Before:  Ronald M. Gould and Jacqueline H. Nguyen, Circuit Judges, and Gregory A. Presnell,[*] District Judge.

Opinion by Judge Nguyen

---

## SUMMARY[**]

### Patient Protection and Affordable Care Act

The panel affirmed in part and reversed in part the district court's dismissal without leave to amend of an action alleging that a health insurer violated the Patient Protection and Affordable Care Act's nondiscrimination mandate by excluding coverage of all hearing loss treatment except cochlear implants.

Plaintiffs claimed that the insurer's plans discriminated against hearing disabled people in violation of section 1557 of the ACA, which incorporates by reference the grounds protected by four earlier nondiscrimination statutes, including the Rehabilitation Act, and prohibits discrimination on those grounds in the health care system, including in health care contracts.  The panel agreed with the district court that plaintiffs failed to state a plausible discrimination claim.  The panel held that the ADA specifically prohibits discrimination in plan benefit design, and a categorical exclusion of treatment for hearing loss

---

[*] The Honorable Gregory A. Presnell, United States District Judge for the Middle District of Florida, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

would raise an inference of discrimination against hearing disabled people notwithstanding that it would also adversely affect individuals with nondisabling hearing loss. But the exclusion here was not categorical. The panel held that while the insurer's coverage of cochlear implants was inadequate to serve plaintiffs' health needs, it might adequately serve the needs of hearing disabled people as a group. Because amendment might not be futile, the panel reversed the district court's dismissal without leave to amend and remanded.

## COUNSEL

Eleanor Hamburger (argued) and Richard E. Spoonemore, Sirianni Youtz Spoonemore Hamburger PLLC, Seattle, Washington, for Plaintiffs-Appellants.

Medora A. Marisseau (argued) and Mark A. Bailey, Karr Tuttle Campbell, Seattle, Washington, for Defendants-Appellees.

Huma Zarif, Northwest Health Law Advocates, Seattle, Washington; Sarah Somers, Elizabeth Edwards, and Wayne Turner, National Health Law Program, Carrboro, North Carolina; for Amici Curiae National Health Law Program and Northwest Health Law Advocates.

Carly A. Myers, Silvia Yee, and Arlene B. Mayerson, Disability Rights Education & Defense Fund, Berkeley, California, for Amici Curiae Disability Rights Education and Defense Fund; National Association of the Deaf; Bazelon Center for Mental Health Law; Hearing Loss Association of America; Hearing Loss Association, Oregon State Association; Washington State Communication

Access Project; Oregon Communication Access Project; and California Communication Access Project.

**OPINION**

NGUYEN, Circuit Judge:

Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116, prohibits covered health insurers from discriminating based on various grounds, including disability. Prior to the ACA's enactment, an insurer could generally design plans to offer or exclude benefits as it saw fit without violating federal antidiscrimination law—in particular, the Rehabilitation Act—so long as the insurer did not discriminate against disabled people in providing treatment for whatever conditions it chose to cover. The primary issue before us is whether the ACA's nondiscrimination mandate imposes any constraints on a health insurer's selection of plan benefits. We hold that it does.

Andrea Schmitt and Elizabeth Mohundro have hearing loss severe enough to qualify them as disabled. They require treatment other than cochlear implants, but their Kaiser health insurance plans exclude all hearing loss treatment except cochlear implants. In a putative class action, Schmitt and Mohundro allege that Kaiser violated section 1557 when designing plan benefits. They claim that Kaiser's categorical exclusion of most hearing loss treatment discriminates against hearing disabled people. The district court ruled that Kaiser's plans do not exclude benefits based on disability because the plans treat individuals with hearing loss alike, regardless of whether their hearing loss is disabling.

We agree with the district court that Schmitt and Mohundro have failed to state a plausible discrimination claim.  The ACA specifically prohibits discrimination in plan benefit design, and a categorical exclusion of treatment for hearing loss would raise an inference of discrimination against hearing disabled people notwithstanding that it would also adversely affect individuals with non-disabling hearing loss.  But the exclusion here is not categorical. While Kaiser's coverage of cochlear implants is inadequate to serve Schmitt and Mohundro's health needs, it may adequately serve the needs of hearing disabled people as a group.  Because the pleadings do not suggest otherwise, we affirm the district court's dismissal of the second amended complaint.  But because amendment may not be futile, we reverse the district court's dismissal without leave to amend and remand so that Schmitt and Mohundro have that opportunity.

## I.  Statutory Background

### A.  Essential Health Benefits

Congress enacted the ACA "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).  The ACA requires most Americans to maintain "minimum essential coverage," 26 U.S.C. § 5000A(a), which they can do through a variety of health insurance plans, such as those provided by their employer or the government or purchased directly from private carriers. *See id.* § 5000A(f). Plans that insurers offer to individuals and small employers must include an

"essential health benefits package."[1]   42 U.S.C. § 300gg-6(a); *see also* 45 C.F.R. § 147.150(a) ("A health insurance issuer offering health insurance coverage in the individual or small group market must ensure that such coverage includes the essential health benefits package . . . .").

The ACA directs the Secretary of Health and Human Services to define, subject to certain constraints, the "essential health benefits" that plans in the individual and small group markets must cover.  42 U.S.C. § 18022(b)(1). The definition must include at least ten specified "general categories" of benefits, including "[r]ehabilitative and habilitative services and devices,"[2] as well as the "items and services" within those categories.  *Id.* § 18022(b)(1), (b)(1)(G).  The scope of coverage must be "equal to the scope of benefits provided under a typical employer plan," and the agency must conduct "a survey of employer-sponsored coverage" to inform its determination.  *Id.* § 18022(b)(2)(A).

Under agency regulations, an insurer providing essential health benefits must offer benefits that are "substantially equal" to a "benchmark" plan set by the state.  45 C.F.R. § 156.115(a)(1).  The State of Washington selects as its

---

[1] A "small" employer generally has no more than 50 employees, but states can extend the definition to encompass up to 100 employees. *See* 42 U.S.C. § 18024 (b)(2)–(3).

[2] The other categories are: "[a]mbulatory patient services"; "[e]mergency services"; "[h]ospitalization"; "[m]aternity and newborn care"; "[m]ental health and substance use disorder services, including behavioral health treatment"; "[p]rescription drugs"; "[l]aboratory services"; "[p]reventive and wellness services and chronic disease management"; and "[p]ediatric services, including oral and vision care." 42 U.S.C. § 18022(b)(1)(A)–(F), (H)–(J).

benchmark plan "the largest small group plan in the state by enrollment," which it supplements "as needed" to ensure coverage of "all of the ten essential health benefits categories." Wash. Rev. Code § 48.43.715(1)–(2); *accord* 45 C.F.R. § 156.100(a)(1). Washington's benchmark plan includes cochlear implants as "rehabilitative services" but excludes "[h]earing aids other than cochlear implants." Wash. Admin. Code § 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(7)(b)(i), (c)(iv).

## B.  Nondiscrimination Statutes

### 1.  The Rehabilitation Act

The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, was the first major federal statute designed to protect the rights of individuals with disabilities. *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990). Its linchpin, section 504, "creates a private right of action for individuals subjected to disability discrimination." *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009); *see* 29 U.S.C. § 794a(a)(2).

Section 504 broadly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any [federally funded] program or activity." 29 U.S.C. § 794(a). However, section 504 does not require an insurer to design plan benefits so as to avoid imposing a disproportionate burden on disabled people—the insurer need only provide disabled people "meaningful access" to whatever benefits it chooses to offer. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). In *Choate*, the Supreme Court rejected a Rehabilitation Act challenge to a state Medicaid regulation that adversely affected a disproportionate number of disabled users of hospital

services. *Id.* at 289.  The Court reasoned that the rule applied equally to disabled and non-disabled people, noting that it was "neutral on its face, [was] not alleged to rest on a discriminatory motive, and [did] not deny [disabled people] access to or exclude them from the particular package of Medicaid services [the state had] chosen to provide."  *Id.* at 309.

### 2.  The Affordable Care Act

Section 1557 of the ACA prohibits certain types of discrimination in health care.  It does so by referencing four other statutes, including section 504 of the Rehabilitation Act, that address discrimination based on various suspect grounds: "race, color, or national origin," 42 U.S.C. § 2000d, "age," *id.* § 6101, "sex," 20 U.S.C. § 1681, and "disability," 29 U.S.C. § 794(a). *See* 42 U.S.C. § 18116(a).  Section 1557 provides that "an individual shall not, on the ground prohibited under [the four enumerated statutes] . . . , be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" receiving federal funding, "including . . . contracts of insurance." *Id.*

### C.  Factual and Procedural History

Schmitt and Mohundro are insured by Kaiser under policies offered through their respective employers.[3]  They both have been diagnosed with disabling hearing loss.  They require treatment other than cochlear implants, such as outpatient office visits to a licensed audiologist and hearing

---

[3] Schmitt is insured by defendant Kaiser Foundation Health Plan of Washington, and Mohundro is insured by Kaiser Foundation Health Plan of Washington Options Inc.  We refer to these entities and the other named defendants collectively as "Kaiser."

aids or other durable medical equipment or prosthetic devices. Their Kaiser policies cover cochlear implants and related screening tests but exclude all other programs or treatments for hearing loss and hearing care.

In October 2017, Schmitt and Mohundro filed this class action against Kaiser, asserting a single claim under the ACA.[4]    They alleged that Kaiser's exclusion of all treatments for hearing loss other than cochlear implants discriminates against putative class members on the basis of their disability in violation of section 1557. The district court granted Kaiser's motion to dismiss their second amended complaint for failure to state a claim and entered judgment.

The district court concluded that "insurers have discretion" over "the scope of benefits provided in the first instance" so long as they "provide [the] benefits offered in a non-discriminatory manner." It therefore ruled that Schmitt and Mohundro's allegations "do not . . . give rise to a plausible inference that they were excluded from participation in or denied the benefits of their health plan under . . . the ACA" because "[t]he benefits plaintiffs seek are not part of the plan in which they participate." Although the court suggested that a coverage exclusion or limitation might "be impermissible and a violation Section 1557 if it were motivated by discriminatory intent," it did not address the issue. The court found that Schmitt and Mohundro failed to raise an inference of discrimination because "the hearing loss exclusion . . . is not designed with reference to a

---

[4] Mohundro was added as a plaintiff in the second amended complaint.

disability and applies to both disabled and nondisabled plan participants."

## II.  Jurisdiction and Standard of Review

The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We review de novo the district court's dismissal of the operative complaint for failure to state a claim.  *See Segalman v. Sw. Airlines Co.*, 895 F.3d 1219, 1222 (9th Cir. 2018).

## III.  Discussion

## A.  Legal Standards Governing a Discrimination Claim Under Section 1557

Applying section 1557 requires an understanding of its relationship to previous civil rights statutes.  Section 1557 incorporates by reference the grounds protected by four earlier nondiscrimination statutes and prohibits discrimination on those grounds in the health care system— as relevant here, in health insurance contracts.  *See* 42 U.S.C. § 18116(a).  In addition to the Rehabilitation Act, section 1557 invokes Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, and the Age Discrimination Act of 1972, 42 U.S.C. § 6101.

Congress occasionally drafts statutes by referencing the substantive provisions of earlier-enacted laws.  *See Panama R.R. v. Johnson*, 264 U.S. 375, 391–92 (1924) (observing that "a generic reference" to an existing statute "is a recognized mode of incorporating one statute or system of statutes into another, and serves to bring into the latter all that is fairly covered by the reference").  The question is how

much of the earlier statutes Congress meant to incorporate. As usual, we start with the statute's text.  *See Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) ("[A]bsent a clearly expressed legislative intention to the contrary . . . the legislative purpose is expressed by the ordinary meaning of the words used." (quoting *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982))).

### (a) In general

Except as otherwise provided for in [the ACA or its amendments], an individual shall not, on the ground prohibited under [Title VI], [Title IX], the Age Discrimination Act . . . , or [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any [federally funded] health program or activity . . . . The enforcement mechanisms provided for and available under such [T]itle VI, [T]itle IX, [Rehabilitation Act], or such Age Discrimination Act shall apply for purposes of violations of this subsection.

### (b) Continued application of laws

Nothing in [the ACA or its amendments] shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under [Title VI], [Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.], [Title IX], [the

> Rehabilitation Act], or the Age
> Discrimination Act . . . , or to supersede
> State laws that provide additional
> protections against discrimination on any
> basis described in subsection (a).

42 U.S.C. § 18116.

The first sentence of section 1557(a) is similar to the first sentence of section 504 of the Rehabilitation Act. Both statutes provide that an individual with a disability shall not, on that ground, "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any [federally-funded health] program or activity." 29 U.S.C. § 794(a); *accord* 42 U.S.C. § 18116(a).

But the two statutes are dissimilar in two respects. First, they differ in scope. Section 1557 is both broader and narrower than the Rehabilitation Act. It is broader because the Rehabilitation Act addresses only disability discrimination, and section 1557 concerns discrimination based on several additional grounds. It is narrower because the Rehabilitation Act addresses disability discrimination generally whereas section 1557 is limited to discrimination in the context of health programs or activities.

Second, the Rehabilitation Act prohibits discrimination "*solely* by reason of [an individual's] disability," 29 U.S.C. § 794(a) (emphasis added), while section 1557 prohibits discrimination "on the ground prohibited under . . . [the Rehabilitation Act]," 42 U.S.C. § 18116(a), *i.e.*, on the ground of disability. In this regard, section 1557 is worded more similarly to the other three statutes it references. *See* 42 U.S.C. § 2000d (prohibiting discrimination "on the ground of race, color, or national origin"); 20 U.S.C. § 1681(a) (same "on the basis of sex"); 42 U.S.C. § 6102

(same "on the basis of age"). While section 1557's omission of the modifier "solely" could point to a less strict causal standard than under the Rehabilitation Act, *see K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013), that presupposes a single legal standard governing all section 1557 claims rather than separate standards for each protected classification drawn from case law interpreting the incorporated statutes.

The text is ambiguous on this score. Section 1557(a) incorporates only the prohibited "ground[s]" and "[t]he enforcement mechanisms provided for and available under" the four civil rights statutes. A prohibited "ground" for discrimination is not typically understood to encompass the legal elements necessary to establish a discrimination claim; it is simply the protected classification at issue. *See, e.g.*, *Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1982 (2017) ("He alleged discrimination on grounds of race, age, and disability . . . ."). And "enforcement mechanism" may mean no more than "the process for compelling compliance with a substantive right, not the substantive right itself." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019). Even if one assumes that "enforcement mechanisms" includes the claims available under the four statutes *and* the standards used to evaluate them, it is unclear from section 1557's text whether a plaintiff alleging one type of discrimination can utilize any of the statutes' enforcement mechanisms or only the one corresponding to the classification at issue.

The agency appears to have taken the view that a plaintiff may take advantage of enforcement mechanisms available in any of the four incorporated statutes. In response to regulations proposed by the Department of Health and Human Services' Office of Civil Rights ("OCR"), several

commenters sought clarification "that all enforcement mechanisms available under the statutes listed in [s]ection 1557 are available to each [s]ection 1557 plaintiff, regardless of the plaintiff's protected class." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,439 (May 18, 2016). Their concern was the availability of a disparate impact theory of discrimination—they believed that Title VI did not allow it but the other three statutes did. *See id.* at 31,440. OCR responded that it "interprets [s]ection 1557 as authorizing a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the legislation." *Id.*

Ordinarily, we would defer to an agency's reasonable interpretation of an ambiguous statute that it administers. *See Rust v. Sullivan*, 500 U.S. 173, 184 (1991). Here, however, OCR's interpretation appears to be based on the assumption that certain civil rights statutes permit disparate impact claims, an assumption that may not be accurate.

Title VI served as the model for Title IX, the Age Discrimination Act, and the Rehabilitation Act, so we interpret the four statutes similarly. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 600 n.4 (1986); *see also Nat'l Coll. Athletic Ass'n v. Smith*, 525 U.S. 459, 466 n.3 (1999) (noting that the statutes are "defined in nearly identical terms"). Title VI implies a private right of action for intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001). For a time, the Supreme Court had construed Title VI to allow disparate impact claims as well. *See Lau v. Nichols*, 414 U.S. 563, 568 (1974) ("Discrimination is barred which has that effect even though no purposeful design is present . . . ."). *Sandoval* shut that door. *See Sandoval*, 532 U.S. at 285 ("[W]e have

since rejected *Lau*'s interpretation of [Title VI] as reaching beyond intentional discrimination.").

Before the disparate impact door closed, though, we and other circuits relied on the Title VI authority to hold that the Rehabilitation Act permits disparate impact claims.  *See, e.g.*, *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996); *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 306 (5th Cir. Unit A Nov. 1981); *NAACP v. Med. Ctr., Inc.*, 657 F.2d 1322, 1331 (3d Cir. 1981) (en banc).  Although it is unclear whether a disparate impact theory remains permissible under the Rehabilitation Act after *Sandoval*, we need not reach that issue because here Schmitt and Mohundro did not allege a disparate impact claim.

Given the similar analytical framework applied to claims under Title VI, Title IX, the Age Discrimination Act, and the Rehabilitation Act, we need not decide whether section 1557 incorporates their legal standards and, if so, how.  The parties agree, and we can assume, that the case law construing the Rehabilitation Act generally applies to claims under section 1557 for disability discrimination by a health care insurer.

A Rehabilitation Act claim requires a showing that (1) the plaintiff is an individual with a disability; (2) she is otherwise qualified to receive the benefit; (3) she was denied the benefits of the program solely by reason of her disability; and (4) the program receives federal financial assistance. *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 55 (2018).  While a private plaintiff must show intentional discrimination under the statutes modeled after Title VI, we interpret this requirement "somewhat more broadly" for Rehabilitation Act claims in

light of that statute's purpose.[5]   *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008).  The claim at issue here— that Kaiser designed its plan benefits in a discriminatory way—inherently involves intentional conduct.[6]   *See id.* at 936 ("To 'design' something to produce a certain, equal outcome involves some measure of intentionality.").

## B.  The ACA Prohibits Discrimination in the Design of Plan Benefits

The ACA provides that "[i]n defining the essential health benefits," the agency must "take into account the health care needs of diverse segments of the population, including . . . persons with disabilities," and "not make coverage decisions . . . *or design benefits* in ways that discriminate against individuals because of their . . . disability."   42 U.S.C. § 18022(b)(4)(B)–(C) (emphasis added).   In line with this directive, the agency promulgated a regulation that an insurer "does not provide [essential health benefits] if its benefit design, or the implementation of its benefit design, discriminates based on an individual's . . . present or predicted disability . . . , or other health conditions."

---

[5]   In drafting the Rehabilitation Act, Congress perceived discrimination against disabled persons "to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference." *Choate*, 469 U.S. at 295.   "[M]uch of the conduct that Congress sought to alter . . . would be difficult if not impossible to reach were the [Rehabilitation] Act construed to proscribe only conduct fueled by a discriminatory intent."   *Id.* at 296–97.   *Choate*'s "meaningful access" standard was an attempt to honor Congressional intent while "keep[ing] § 504 within manageable bounds."   *Id.* at 299.

[6]   To be entitled to monetary damages, however, Schmitt and Mohundro "must prove a *mens rea* of 'intentional discrimination' . . . by showing 'deliberate indifference' [or] 'discriminatory animus.'"   *Mark H.*, 513 F.3d at 938.

45 C.F.R. § 156.125(a). Another regulation prohibits health insurers from "[having] or implement[ing] . . . benefit designs that discriminate on the basis of . . . disability." *Id.* § 92.207(b)(2). Benefit design, though intentionally undefined, "includ[es] covered benefits, *benefits limitations or restrictions*, and cost-sharing mechanisms, such as coinsurance, copayments, and deductibles." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. at 31,376 (emphasis added).

In holding that the Rehabilitation Act does not cover discriminatory plan benefit design, the Supreme Court rejected a group of Medicaid recipients' attempt to define the benefit at issue as "the amorphous objective of 'adequate health care.'" *Choate*, 469 U.S. at 303. "Medicaid programs," the Court explained, "do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs," *id.*, and states have long had "discretion to choose the proper mix of amount, scope, and duration limitations on services covered by state Medicaid." *Id.* at 307. The Rehabilitation Act does not impose a general requirement on "each recipient of federal funds first to evaluate the effect on [disabled people] of every proposed action that might touch [their] interests . . . , and then to consider alternatives for achieving the same objectives with less severe disadvantage to [them]." *Id.* at 298, 307.

The ACA, in contrast, does almost all of this. While it does not guarantee individually tailored health care plans, it attempts to provide adequate health care to as many individuals as possible by requiring insurers to provide essential health benefits. And it imposes an affirmative obligation not to discriminate in the provision of health care—in particular, to consider the needs of disabled people

and not design plan benefits in ways that discriminate against them.

Thus, the ACA allows a claim for discriminatory benefit design notwithstanding that, under *Choate*, the Rehabilitation Act does not. In arguing otherwise, Kaiser relies on several incorrect assumptions.

### 1. Compliance with a state's benchmark plan does not guarantee compliance with section 1557

Kaiser assumes that an insurer's compliance with the essential health benefits in a state's benchmark plan was sufficient to comply with the ACA's nondiscrimination requirement. According to Kaiser, "[t]he ACA did not include hearing aids or services as an [essential health benefit]" and the Secretary of Health and Human Services "left it to each state to articulate the scope of essential health benefits . . . through the adoption of a 'benchmark' plan."

As discussed, the ACA requires that essential health benefits not only include the ten specified categories of coverage, but also take into account the needs of persons with disabilities and not be designed in ways that discriminate against them. *See* 42 U.S.C. § 18022(b)(4)(B)–(C). The ten general categories of benefits were intended to be a *minimum* requirement, *see id.* § 18022(b)(1) ("[Essential health] benefits shall include at least the following . . . ."), subject to additional limitations and "[r]equired elements for consideration," *id.* § 18022(b)(4), such as nondiscrimination in benefit design.

ACA regulations also make clear that a state-selected benchmark plan is only the starting point for determining essential health benefits. They define "base-benchmark plan" to mean "the plan that is selected by a State from the

options [provided for by regulation], *prior to any adjustments made* pursuant to the benchmark standards." 45 C.F.R. § 156.20 (emphasis added). The regulations distinguish the base-benchmark plan selected by a state from an "EHB-benchmark plan," which is "the standardized set of essential health benefits that must be met" by an insurer. *Id.* "In order to become an EHB-benchmark plan . . . , a state-selected base-benchmark plan must meet the requirements for coverage of benefits and limits described in [45 C.F.R.] § 156.110"—*i.e.*, the benchmark standards. *Id.* § 156.100(b).[7]

The benchmark standards require the benchmark plan to include the ten essential benefit categories, 45 C.F.R. § 156.110(a), but they also require that the plan "[n]ot include discriminatory benefit designs that contravene the non-discrimination standards," *id.* § 156.110(d). The nondiscrimination standards, in turn, provide that an insurer "does not provide [essential health benefits] if its benefit design . . . discriminates based on an individual's . . . present or predicted disability . . . or other health conditions." *Id.* § 156.125(a).

Congress authorized the Secretary of Health and Human Services to promulgate regulations implementing the nondiscrimination provision in section 1557 specifically. *See* 42 U.S.C. § 18116(c). In doing so, OCR explained that compliance with federal and state law regarding essential

---

[7] This was the regulation in effect for the plan years prior to 2020. The regulation currently in effect similarly provides that a state's EHB-benchmark plan must "[p]rovide benefits for diverse segments of the population, including . . . persons with disabilities," and "[n]ot include discriminatory benefit designs that contravene the non-discrimination standards defined in [45 C.F.R.] § 156.125." 45 C.F.R. § 156.111(b)(2)(iv)–(v).

health benefits did not guarantee compliance with the ACA's nondiscrimination requirement.    Commenters on the proposed regulations expressed concern that "a State might approve a plan that OCR might later find discriminatory," and they suggested "allow[ing] issuers to be deemed compliant with [s]ection 1557 if they are compliant with existing Federal or State law." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. at 31,377.    The agency rejected this suggestion, finding that it would be "inappropriate to define requirements under Federal law based on what could be the varying, and potentially changing, requirements of different States' approaches." *Id.* at 31,377–78.    The agency observed that its approach "is consistent with the approach taken by other agencies to civil rights obligations, in which compliance with one set of requirements, adopted under different laws or for different purposes, is not considered automatic compliance with civil rights obligations." *Id.* at 31,378.

The State of Washington does not even require compliance with section 1557 when its insurance commissioner establishes the state's benchmark plan.    The relevant statute provides that the insurance commissioner "*[m]ust* ensure that the [benchmark] plan covers the ten essential health benefits categories," and "*[m]ay* consider whether the health plan has a benefit design that would create a risk of biased selection based on health status and whether the health plan contains meaningful scope and level of benefits in each of the ten essential health benefits categories." Wash. Rev. Code Ann. § 48.43.715(3)(a)–(b) (emphasis added).    But even if a state required its benchmark plan to incorporate nondiscrimination principles, whether or not it complied with section 1557 is a question of federal law on which we owe the state no deference. *Cf. Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 682–83 (9th Cir.

2004) ("[A] question of federal law . . . cannot be conclusively resolved in and of itself by the state legislature's mere statement.").

**2. The specific regulation prohibiting categorical coverage exclusions for gender transition treatment does not implicitly sanction categorical coverage exclusions for other conditions**

The regulations implementing section 1557 prohibit "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition." 45 C.F.R. § 92.207(b)(4). Kaiser assumes that the agency's inclusion of a regulation specific to gender dysphoria signals the agency's implicit unwillingness to prohibit similar categorical exclusions for treatments of other conditions.

Application of the canon *expressio unius est exclusio alterius* might be understandable in the abstract, *see, e.g.*, *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir. 2019), *cert. denied*, No. 19-995 (U.S. Apr. 27, 2020), though we have rejected it in similar circumstances, *see Mark H. v. Hamamoto*, 620 F.3d 1090, 1100 (9th Cir. 2010) ("That one regulation identifies a specific requirement for compliance with the Rehabilitation Act § 504 . . . does not negate the broader rule that a federally funded entity violates the Rehabilitation Act § 504 if it denies a qualified disabled person the reasonable accommodation that the person needs in order to enjoy meaningful access to a program or service."). In any event, the agency explained that that was not its intent.

The agency "received a number of comments requesting that OCR add language to [45 C.F.R.] § 92.207(b) clarifying that categorical exclusions of certain conditions, such as coverage related to developmental disabilities or maternity

care, are prohibited." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. at 31,434. The agency declined to do so. Critically, however, it acknowledged that "categorical exclusions of all coverage related to certain conditions could raise significant compliance concerns under [s]ection 1557." *Id.* The agency did not provide more explicit guidance because it believed that "existing regulatory language is sufficient to address this scenario." *Id.*

The reason for a special regulation pertaining to gender transition was that blanket exclusions of treatment have historically been justified "because [the treatments] have been viewed as cosmetic or experimental." *Id.* Because a treatment exclusion on these grounds could be seen as a nondiscriminatory reason that comports with section 1557, the agency clarified that it does not share that view. *See id.* at 31,435 ("[T]he across-the-board categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care.").

### 3. Requiring nondiscriminatory plan benefit design does not require insurers to cover all treatment

Kaiser also assumes that if the ACA's nondiscrimination provision applies to plan benefit design, "every federally-funded health insurer would need to immediately amend its health plans and policies to cover hearing aids and related services, and by extension, all other services and equipment that might treat any other potentially disabling conditions." But the agency made clear that while discriminatory benefit design is incompatible with essential health benefits, *see* 45 C.F.R. § 156.125(a), "[n]othing . . . prevent[s] an issuer from appropriately utilizing reasonable medical management techniques," *id.* § 156.125(c).

> The final rule does not . . . require covered entities to cover any particular procedure or treatment.  It also does not preclude a covered entity from applying neutral, nondiscriminatory standards that govern the circumstances in which it will offer coverage to all its enrollees in a nondiscriminatory manner.  The rule prohibits a covered entity from employing benefit design or program administration practices that operate in a discriminatory manner.

Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. at 31,434.

It is possible that Kaiser has a reasonable, nondiscriminatory reason for its blanket exclusion of treatment for hearing loss other than cochlear implants. Even if Schmitt and Mohundro ultimately prevail in this litigation and Kaiser is forced to withdraw its blanket prohibition on coverage for hearing loss treatment other than cochlear implants, it still could exclude specific hearing loss treatments based on nondiscriminatory standards.  For example, it may be reasonable for Kaiser to exclude coverage of a particular hearing loss treatment that is experimental or has a high cost-to-benefit ratio.  At this stage in the litigation, however, the question is whether the blanket exclusion of non-cochlear treatment raises an inference of discrimination.

## C. The Second Amended Complaint Fails to State a Claim

Schmitt and Mohundro argue that Kaiser's categorical exclusion of coverage for hearing loss treatment other than cochlear implants is a form of proxy discrimination.  "[Proxy

discrimination] arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019) (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)). "For example, discriminating against individuals with gray hair is a proxy for age discrimination because 'the "fit" between age and gray hair is sufficiently close.'" *Id.* at 837–38 (quoting *Pac. Shores Props.*, 730 F.3d at 1160 n.23).

Schmitt and Mohundro contend that hearing loss is a proxy for hearing disability. All individuals with hearing disability have hearing loss because "disability" is defined in part as "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), including "hearing," *id.* § 12102(2)(A). But since not all hearing loss is substantial, at least some—and potentially most—individuals with that condition are not deemed disabled.

That the hearing loss exclusion also affects some non-disabled individuals does not doom Schmitt and Mohundro's claim per se, since "overdiscrimination is prohibited." *Pac. Shores Props.*, 730 F.3d at 1160. "Discriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group," yet "such laws, policies, or actions are discriminatory when they are undertaken for the purpose of harming protected individuals." *Id.*

The Supreme Court considered an overinclusive proxy in *Rice v. Cayetano*, 528 U.S. 495 (2000), where a state law discriminated on the basis of ancestry, providing benefits to

individuals whose lineage traced to pre-1778 Hawaii.  The state argued that the classification was not race-based in part because Polynesians were not the only race in Hawaii in 1778.  *Id.* at 514.  Rejecting that argument, the Supreme Court observed that "[a]ncestry can be a proxy for race," and "[e]ven if the residents of Hawaii in 1778 had been of more diverse ethnic backgrounds and cultures, it is far from clear that a voting test favoring their descendants would not be a race-based qualification."  *Id.* at 514.

Here, Schmitt and Mohundro allege no facts giving rise to an inference of intentional discrimination besides the exclusion itself.  Thus, the crucial question is whether the proxy's "fit" is "sufficiently close" to make a discriminatory inference plausible.  *Davis*, 932 F.3d at 838 (quoting *Pac. Shores Props.*, 730 F.3d at 1160 n.23).  The second amended complaint sheds no light on the answer.

The complaint does not make clear to what extent the proxy is overinclusive.  Schmitt and Mohundro allege that "[u]nder the Exclusion, only people with Hearing Loss, a qualifying disability, are excluded from the benefits that they require."  However, they define "people with Hearing Loss" to include all persons with hearing loss that cannot be treated with cochlear implants—not just those with disabilities—so it is impossible to infer whether the exclusion primarily affects disabled persons.  Schmitt and Mohundro claim in their brief that "few, if any, non-disabled insureds had claims denied under the Hearing Loss Exclusion," but this allegation is not in their second amended complaint and in any event requires further explanation to be plausible.[8]

---

[8] We recognize that prior to discovery it may be difficult for Schmitt and Mohundro to allege with statistical accuracy the number of policy

At the same time, Schmitt and Mohundro's alleged proxy is underinclusive because it excludes hearing disabled individuals who "require or will require treatment . . . associated with cochlear implants." Just as "[t]he benefit . . . cannot be defined in a way that effectively denies otherwise qualified [disabled] individuals the meaningful access to which they are entitled," *Choate*, 469 U.S. at 301, a section 1557 plaintiff cannot define the benefit so narrowly as to require an insurer to curate coverage for each individual's health care needs. Kaiser covers cochlear implants and related services, and some proportion of hearing disabled insureds can meet their treatment needs through cochlear implants alone. We are left to guess what that proportion might be. The district court asserted that cochlear implants are "medically appropriate only when the hearing loss is significant and therefore disabling," but that assertion is not in the complaint. Still, nothing in the complaint suggests otherwise. If cochlear implants serve the needs of most individuals with hearing disability, that fact would tend to undermine a claim of proxy discrimination.

Because Schmitt and Mohundro's allegations fail to show the fit of their alleged proxy, they do not state a claim

claims by disabled persons relative to non-disabled persons that were denied under the hearing loss exclusion, as this information may reside exclusively with Kaiser. At the pleadings stage, we do not require a plaintiff to allege enough detail to state a prima facie case of discrimination, *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)—only "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Schmitt and Mohundro may be able to meet this burden, for example, by alleging facts showing how the needs of hearing disabled persons differ from the needs of persons whose hearing is merely impaired such that the exclusion is likely to predominately affect disabled persons.

for disability discrimination under section 1557. We therefore affirm the district court's dismissal of the second amended complaint. "[I]n dismissing for failure to state a claim under Rule 12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). Because Schmitt and Mohundro may be able to amend their pleading with details that would raise an inference of proxy discrimination or some other theory of relief, we reverse the district court's decision not to allow amendment and remand with instructions to do so.

**AFFIRMED in part, REVERSED in part, and REMANDED.**