In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2495

T.S., by and through his parents and guardians, T.M.S. and M.S., individually and derivatively on behalf of the Heart of CarDon, LLC Employee Benefit Plan,

*Plaintiff-Appellee,*

*v.*

HEART OF CARDON, LLC & HEART OF CARDON, LLC
EMPLOYEE BENEFIT PLAN,

*Defendants-Appellants.*

————————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cv-01699-TWP-MG — **Tanya Walton Pratt**, *Chief Judge.*

————————————

ARGUED FEBRUARY 10, 2022 — DECIDED AUGUST 5, 2022

————————————

Before MANION, KANNE[*], and JACKSON-AKIWUMI, *Circuit Judges.*

———————

[*] Circuit Judge Kanne died on June 16, 2022, and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

MANION, *Circuit Judge*. This interlocutory appeal concerns section 1557 of the Patient Protection and Affordable Care Act, which prohibits a healthcare entity from discriminating against an individual based on disability, among other grounds, if that entity receives federal financial assistance.

Heart of CarDon, LLC (CarDon) is a healthcare provider and is reimbursed by Medicare and Medicaid for its services. Through the self-funded Heart of CarDon, LLC Employee Benefit Plan (Plan), CarDon also provides health insurance to its employees and their dependents. T.S. is such a dependent and has autism. He sued CarDon, alleging that the Plan's exclusion of coverage for autism treatment violates section 1557.

The merits of that question are not before us. CarDon moved for judgment on the pleadings on the theory that T.S.'s suit does not fall within the zone of interests protected by the statute. In CarDon's view, only a person who is an intended beneficiary of the federal dollars it gets—that is, a recipient of CarDon's healthcare services—is a permissible plaintiff under section 1557. The district court denied the motion but allowed CarDon to seek immediate review in this court.

We affirm. T.S.'s suit jibes with section 1557's text and purpose and thus falls within the zone of interests that provision is meant to protect. What's more, the intended-beneficiary limitation CarDon advocates is based on precedent that Congress has effectively abrogated. Because T.S. is a proper plaintiff under section 1557, this litigation may continue.

## I. Background

### A.

Enacted in 2010, the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119, brought

about the most extensive changes to the U.S. healthcare system in decades. It aimed "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). Usually, legislation with such sweeping goals will be voluminous. And the ACA is no exception. Its text covers over 900 pages.

Fortunately, the ACA provision directly at issue here has fewer than 200 words. Titled "Nondiscrimination," section 1557 states that "an individual shall not, on the ground prohibited under" any of four specified federal statutes, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." 42 U.S.C. § 18116(a).

The specified statute relevant to this case is the Rehabilitation Act of 1973, section 504 of which states that an individual shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The other three statutes supplying the grounds on which section 1557 prohibits discrimination are: Title VI of the Civil Rights Act of 1964 (race, color, and national origin), Title IX of the Education Amendments of 1972 (sex), and the Age Discrimination Act of 1975 (age).

In addition to prohibiting discrimination based on these grounds, section 1557 directs that "enforcement mechanisms provided for and available under" the specified statutes "shall

apply for purposes of violations of this subsection." 42 U.S.C. § 18116(a).

## B.

Because this matter comes to us at a preliminary stage of proceedings, we accept the following factual allegations as true. *See Taylor v. JPMorgan Chase Bank, N.A.*, 958 F.3d 556, 562 (7th Cir. 2020). CarDon operates a skilled-nursing and assisted-living facility and is therefore principally in the business of providing healthcare to its patients and residents. (We'll refer to both groups simply as CarDon's "patients" from now on.) Medicare and Medicaid reimburse CarDon for some of its patient services. CarDon also sponsors the Plan, a self-funded group health plan, for its employees and their dependents. The Plan, designed by CarDon, provides a range of medical, surgical, and mental-health benefits.

T.S. is the minor child of one of CarDon's employees and is enrolled as a beneficiary of the Plan. At a young age, T.S. was diagnosed with Autism Spectrum Disorder, a neurological condition "characterized by persistent deficits in social communication and social interaction across multiple contexts," as well as "restricted, repetitive patterns of behavior, interests, or activities." His diagnosing physician recommended that T.S. undergo Applied Behavioral Analysis (ABA) therapy. Widely used to treat autistic children, ABA therapy involves "repetitive, task-and-reward-based activities designed to teach … skills such as imitating others, making eye contact, listening, and appropriately answering questions." T.S.'s physician thought the therapy would help maintain and advance his motor, speech, and communication skills. The Plan's third-party administrator at the time authorized six months of ABA therapy, and T.S. began treatment.

But a new Plan administrator soon took over. T.S. had received only a few months' treatment when continued coverage for ABA therapy was denied. The administrator cited the Plan's "Behavioral Health" section, which specifically excludes "Charges for services, supplies, or treatment for Autism, Asperger's and Pervasive Development Disorders" and "Charges for [ABA therapy]." Because his parents could not afford to pay for treatment out-of-pocket, T.S. did not receive ABA therapy from February 2019 through March 2020. (Beginning in March 2020, T.S. was able to receive ABA therapy with coverage through Indiana's Medicaid waiver program, but in the interim his development suffered.)

Through his parents, T.S. sued, alleging CarDon intentionally discriminated against him on the basis of his disability by designing and (through its administrator) enforcing the Plan, which categorically excludes coverage for autism and the ABA therapy used to treat it.

CarDon moved for judgment on the pleadings, but the district court rejected the argument that T.S. wasn't in a class of plaintiffs authorized to sue under section 1557.[1] Rather, the court concluded that his claim fell within the zone of interests protected by the ACA provision. The court declined to reconsider its ruling but certified the order denying CarDon's motion for interlocutory appeal. Proceedings below are stayed pending resolution of this matter.

---

[1] The district court did grant judgment to CarDon on T.S.'s claims under the Employee Retirement Income Security Act and the Mental Health Parity and Addiction Equity Act. Those claims are not at issue here.

## II. Analysis

Although the district court has not yet entered a final judgment in this case, we have jurisdiction under 28 U.S.C. § 1292(b) because the court certified its denial order as to the ACA claim for interlocutory review, and we granted the petition to appeal. In this posture, we do not resolve the legal merits of T.S.'s discrimination claim, only his right to bring suit under section 1557.

For purposes of this appeal, CarDon does not dispute that its primary business is providing healthcare, that it receives federal financial assistance (in the form of Medicare and Medicaid payments), or that it sponsors the self-funded group health Plan. But CarDon does argue that T.S. is outside the zone of interests protected by section 1557 because, under that provision, only an intended beneficiary of the federal funds CarDon receives in connection with patient care is a proper plaintiff. This conclusion, CarDon continues, is also compelled by our precedent.

### A.

The zone-of-interests inquiry has sometimes been identified as an aspect of "prudential standing," but that is inaccurate. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied," so "it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* at 128. Properly understood, the zone-of-interests analysis asks whether a "particular class of persons has a right to sue under" a specific "substantive statute." *Id.* at 127 (brackets omitted). A court, by "using traditional tools of statutory

interpretation," must determine "whether a legislatively con-
ferred cause of action encompasses a particular plaintiff's
claim." *Id.* If not, that plaintiff's suit cannot continue. There
may be some overlap between zone-of-interests and merits
analyses, but a court must take care not to conflate the two.
*See Harzewski v. Guidant Corp.*, 489 F.3d 799, 803–04 (7th Cir.
2007).

We generally understand the zone-of-interests doctrine to
ask "whether the statute arguably protects the sort of interest
a would-be plaintiff seeks to advance." *Stockbridge-Munsee
Cmty. v. Wisconsin*, 922 F.3d 818, 821 (7th Cir. 2019). The anal-
ysis has two steps. First, we ascertain the purpose of a partic-
ular statutory provision, thereby identifying the interests ar-
guably to be protected by it. Then, we determine whether the
interests claimed by the plaintiff are among those statutory
interests. *See Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d
882, 892–93 (7th Cir. 2019). What we do not ask is whether, in
enacting the particular provision, Congress had this specific
sort of plaintiff in mind. *Nat'l Credit Union Admin. v. First Nat'l
Bank & Trust Co.*, 522 U.S. 479, 492 (1998).

The zone-of-interests inquiry is a legal one, so our review
is *de novo*. *Cook County v. Wolf*, 962 F.3d 208, 218 (7th Cir. 2020).

## B.

As noted already, section 1557 states that "an individual
shall not," on various grounds including disability, "be ex-
cluded from participation in, be denied the benefits of, or be
subjected to discrimination under, any health program or ac-
tivity, any part of which is receiving Federal financial assis-
tance." § 18116(a). Congress did not explicitly articulate the
purpose of section 1557, but the provision's language makes

clear the scope of interests it protects. Section 1557 "outlaws discrimination" on enumerated grounds "by healthcare entities receiving federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1569 (2022). By linking the prohibition to federal funding, the provision seeks to prevent federal resources from supporting discriminatory conduct; and by authorizing a private right of action, it seeks to provide individuals a means of protecting themselves from such conduct. *Cf. C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 540 (7th Cir. 2022) (en banc) (noting the purposes of the similarly worded Title IX, prohibiting sex discrimination under "any education program or activity").

Thus, section 1557 extends a cause of action to individuals who have been subjected, based on their disabilities, to discrimination by healthcare entities. T.S.'s allegations bring him well within that class of plaintiffs. He asserts that CarDon, a healthcare entity, designed and controlled the Plan so as to exclude him from certain coverage because of his autism. This type of claim falls within the zone of interests that section 1557 protects.

## C.

CarDon contests this straightforward analysis. It argues that only intended beneficiaries of the federal funds it receives, namely, its patients, are permissible plaintiffs under section 1557. Since T.S. is not a patient of CarDon, he isn't a permissible plaintiff, or so the reasoning goes. But this argument is not supported by section 1557's text.

To start, section 1557 forbids discrimination against, and provides a private right of action to, "an individual"—not a "patient" of a health program or a "beneficiary" of federal

financial assistance. "Congress easily could have substituted" these words for "individual" "if it had wished to restrict the scope" of section 1557 the way CarDon advocates. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (making the same point about Title IX's use of "person"). But it didn't. CarDon's patients may be the most obvious individuals whose interests are protected by section 1557's broadly worded text, but that does not mean they are the only ones covered by its language. See, for example, *Thompson v. North American Stainless, LP*, 562 U.S. 170, 177–78 (2011), where the zone of interests allowed one employee to invoke federal antiretaliatory protections when he was purportedly fired because *another* employee (his fiancée) filed a discrimination complaint against their mutual employer.

T.S. alleges that he was the direct victim of the particular ill (intentional disability discrimination) from which the plain language of the statute was meant to protect him. His interests and section 1557's goals squarely align. That suffices under the zone-of-interests test. *Cf. Ass'n of Am. Physicians & Surgs., Inc. v. Koskinen*, 768 F.3d 640, 642–43 (7th Cir. 2014) (finding that doctors who did not accept insurance were not within a class of plaintiffs who could sue to enforce the ACA's mandatory-insurance provisions).

CarDon next focuses on the phrase "any health program or activity, any part of which is receiving Federal financial assistance." Because the only part of its operations that receives federal aid is its patient care in the form of Medicare and Medicaid payments, CarDon contends that section 1557's zone of interests must be limited to its patients to avoid a "mismatch" between the federal funding and the individuals it benefits. Again, we are unpersuaded.

The ACA does not explicitly define "health program or activity." But when the ACA was enacted in 2010, "program or activity" was already a term of art with a clear meaning and a broad scope established by the provisions cited in section 1557 that ban discrimination in connection with federal financial assistance. We thus read "program or activity" in accordance with the "prevailing understanding" the term had under the law that Congress relied on when codifying section 1557. *George v. McDonough*, 142 S. Ct. 1953, 1963 (2022); *see United States v. Abbas*, 560 F.3d 660, 663–64 (7th Cir. 2009).

Specifically, section 504 of the Rehabilitation Act defines "program or activity" as "all of the operations of"—among other entities—"an entire corporation, partnership, or other private organization, … which is principally engaged in the business of providing … health care … ; any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b). The meaning of "program or activity" in section 1557's other antidiscrimination provisions is materially identical. *See* 20 U.S.C. § 1687; 42 U.S.C. § 6107(4); 42 U.S.C. § 2000d-4a. As we discuss below, this definition reflected a deliberate move by Congress through the Civil Rights Restoration Act of 1987 to repudiate the notion that "program or activity" referred *only* to the part of an organization directly receiving federal funds. This had been the understanding of the phrase for decades when the ACA was drafted and enacted in 2010. So, contrary to CarDon's reading, "program or activity" in section 1557 is not limited to the discrete portion of its operations that receives Medicare and Medicaid reimbursements.

Of course, section 1557 uses the phrase "*health* program or activity." To what extent the modifier "health" limits section 1557's application to certain types of entities—or to only

certain parts of certain entities—is an issue that has swelled the pages of the Federal Register as HHS regulators continually reconsider the question.[2] Given this regulatory churn, it's unsurprising that both parties have been able to cite HHS rules and statements to support their respective arguments.

Thankfully, it is unnecessary to determine which HHS rules are entitled to deference since we need not rely on them to resolve this appeal. Agency interpretation of a statue becomes relevant only where a court cannot discern clear meaning from the statute itself; that is not the case here. *See Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). The phrase "health program or activity" in section 1557 plainly includes all the operations of a business principally engaged in providing healthcare, and CarDon concedes that it is such an entity. That ends the inquiry.

But even considering the rules that CarDon invokes, we find no support for its position. Consistent with our reading of the term, HHS's current interpretation is that "'health program or activity' encompasses all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance." 45 C.F.R. § 92.3(b) (2021). By contrast, section 1557 applies only to the part of an entity's operations that receives federal funding when the

---

[2] For example, HHS initially interpreted "health program or activity" generally to include entities principally engaged in providing or administering health insurance. 81 Fed. Reg. 31,376, 31,385–86 (May 18, 2016). Four years later, the agency thought again and adopted an interpretation that generally *excluded* insurers. 85 Fed. Reg. 37,160, 37,171–74 (June 19, 2020). Even as we decide this case, HHS is in the process of proposing to "reinstate the rule clarifying that Section 1557 generally applies to many health insurance issuers." 87 Fed. Reg. 47,824, 47,828 (Aug. 4, 2022).

entity is *not* principally engaged in providing healthcare. *Id.* But since CarDon concededly *is* in the healthcare business, all its operations are considered part of a "health program or activity"—even if they are not federally funded.

Cardon also relies on subsection (c), which states: "For purposes of this part, an entity principally or otherwise engaged in the business of providing health insurance shall not, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare." § 92.3(c). To CarDon, this passage distinguishes between an employer-sponsored health plan and the sponsoring employer's operations, and this distinction "informs the zone of interests question." But that is not what subsection (c) does. The distinction it recognizes is the one set out in subsection (b) between entities principally engaged in the healthcare business and those not. Subsection (c) explains that providing health insurance does not constitute providing healthcare and cannot, by itself, turn an entity into one "principally engaged in the business of providing healthcare." Contrary to CarDon's suggestion, the "otherwise engaged" language doesn't mean that an entity established as one principally providing healthcare will lose that status simply because it in some way also provides health insurance.

Because section 1557's prohibition on discrimination is not, by its own terms, limited to the discrete portion of a covered entity that receives federal financial assistance, the right to sue under section 1557 is not limited to plaintiffs who are intended to benefit from that assistance. T.S.'s claim that he was the victim of intentional disability discrimination in one part of CarDon's operations falls within the zone of interests

protected by section 1557. The provision's purpose and text foreclose a different conclusion.

D.

Finally, CarDon argues that T.S.'s claim falls outside section 1557's zone of interests because of *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226 (7th Cir. 1980). There, we held that, to maintain a private action for disability discrimination under section 504 of the Rehabilitation Act, a plaintiff had to be an intended beneficiary of a specific program or activity that received federal funds.

According to CarDon, this holding effectively defined section 504's zone of interests. Because section 1557 of the ACA incorporates the "enforcement mechanisms" available under section 504 of the Rehabilitation Act, CarDon contends that *Simpson* limits the class of disability-discrimination plaintiffs under section 1557 to the intended beneficiaries of the federal financial assistance CarDon receives. Plan enrollees like T.S. are not intended beneficiaries of the Medicare or Medicaid payments CarDon receives and thus, the argument concludes, do not have claims within section 1557's zone of interests.

All courts agree that a private right of action is an enforcement mechanism. If one of the statutes cited in section 1557 provides a private right of action to challenge discrimination on a particular ground, section 1557 imports that right. *See, e.g., Tomei v. Parkwest Med. Ctr.*, 24 F.4th 508, 514 (6th Cir. 2022); *Kadel v. N.C. State Health Plan Teachers & State Emps.*, 12 F.4th 422, 431 (4th Cir. 2021); *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 953–54 (9th Cir. 2020). The Rehabilitation Act authorizes private individuals to sue to enforce its prohibition on disability discrimination, 29 U.S.C.

§ 794a(a)(2); *Cummings*, 142 S. Ct. at 1569–70, so that is available to T.S. under section 1557. But what else forms part of an enforcement mechanism is less clear.

The leading interpretation is that "'enforcement mechanism' refers to the process for compelling compliance with a substantive right." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019). On that understanding, the Sixth Circuit has held that section 1557 does not import the statutes of limitations that the Rehabilitation Act borrows from state laws and applies to private suits. *Tomei*, 24 F.4th at 514. The Fourth Circuit, on the other hand, has reasoned that section 1557 incorporates Title IX's waiver of sovereign immunity because it is "an inseparable component" of Title IX's private right of action. *Kadel*, 12 F.4th at 431, 433.

Is the intended-beneficiary limitation on private suits discerned by *Simpson* in the Rehabilitation Act more akin to a statute of limitations or a waiver of sovereign immunity? CarDon doesn't offer much beyond a bare assertion that the limitation is part of the Rehabilitation Act's enforcement mechanism, and T.S. does not dispute that. He simply asserts *Simpson* is no longer good law on that point. Absent any illuminating argument, we will assume without deciding that, if the Rehabilitation Act were to limit the zone of interests it protects to intended beneficiaries of federal financial assistance, that limitation would be part of the enforcement mechanism that section 1557 imports.

That assumption is ultimately of no help to CarDon, however. Congress effectively abrogated *Simpson* through legislation that rejected the decision's relevant reasoning. We conclude that *Simpson* is not binding authority in this area. To understand this conclusion, some background is necessary.

When enacted in 1973, section 504 of the Rehabilitation Act
did not define "program or activity receiving Federal finan-
cial assistance." *See* Pub. L. No. 93-112, 87 Stat. 355, 394. That
was still true in 1980 when *Simpson* was decided. The plaintiff
in that case filed suit against his employer under section 504,
alleging that his discharge was due to discrimination against
his disability and that his employer received federal funds in
the form of direct apprenticeship subsidies for veterans.
629 F.2d at 1228–29.

In affirming the claim's dismissal, we concluded that
Simpson had "not demonstrated any nexus between his dis-
charge and the federal assistance." *Id.* at 1232. Section 504 did
not "generally forbid discrimination against the handicapped
by recipients of federal assistance" but instead required the
discrimination to "have some direct or indirect effect on the
handicapped persons *in* the program or activity receiving fed-
eral financial assistance." *Id.* (emphasis added); *see also id.* at
1233.

This conclusion, we reasoned, was supported by interpre-
tations of Title VI, on which the Rehabilitation Act's antidis-
crimination provision was based. *Id.* at 1234. Because Title VI
did not permit a private remedy for "discrimination by insti-
tutions receiving federal funds unless the allegedly discrimi-
natory act causes discrimination against the *primary or in-
tended beneficiaries* of the federal financial assistance," neither
did section 504. *Id.* (emphasis added). Thus, *Simpson* rejected
the contention "that federal assistance to one part of an em-
ployer's business thereby brings the entire business under the
coverage of [section] 504." *Id.* at 1236. And in doing so, *Simp-
son* linked the intended-beneficiary and program-specific-

funding concepts in defining the permissible class of plaintiffs under section 504. *See id.* at 1233–34 & n.12.

Four years later, the Supreme Court also read "program or activity receiving Federal financial assistance" to narrow the reach of the Rehabilitation Act's discrimination protections. "Clearly," the Court said, "this language limits the ban on discrimination to the specific program that receives federal funds." *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 636 (1984). This meant that, to sue under section 504, the purported victim had to have been discriminated against by that discrete program or activity. *Id.* That is the way the Court also read the materially identical language in Title IX. *See Grove City College v. Bell*, 465 U.S. 555, 573–75 (1984); *N. Haven*, 456 U.S. at 535–40 (both discussing the discrimination prohibition's "program-specific," rather than institution-wide, coverage).

Congress did not agree. Finding that the Supreme Court's decisions had "unduly narrowed or cast doubt upon … the broad, institution-wide application of" antidiscrimination-in-federal-funding statutes like the Rehabilitation Act, Congress responded with the Civil Rights Restoration Act of 1987. Pub. L. No. 100-259, § 2(1), 102 Stat. 28, 28 (1988). That legislation added to the Rehabilitation Act (and other federal statutes cited in section 1557 of the ACA) the definition of "program or activity" quoted earlier in our analysis, namely, "all of the operations of … an entire corporation, partnership, or other private organization, … which is principally engaged in the business of providing … health care … ; any part of which is extended Federal financial assistance." § 4, 102 Stat. at 29–30. The CRRA therefore clearly "broadened the coverage" of the relevant antidiscrimination provisions. *Franklin v. Gwinnett*

*County Pub. Sch.*, 503 U.S. 60, 73 (1992); *see also Brumfield v. City of Chicago*, 735 F.3d 619, 626 n.4 (7th Cir. 2013).

We concur with the district court's conclusion that the CRRA "dismantled the foundation" of *Simpson*'s holding.[3] *Simpson* understood section 504 of the Rehabilitation Act to provide a cause of action only for intended beneficiaries of federal financial assistance—those affected by the specific part of an institution being funded. Congress thereafter amended section 504's text to disapprove that narrow interpretation and make explicit that "program or activity" meant "all of the operations of" a covered entity. Thus, the intended-beneficiary, program-specific condition that *Simpson* placed on a plaintiff seeking relief for discrimination under the Rehabilitation Act did not survive passage of the CRRA. And, as we've already noted, the zone-of-interests test does not narrowly limit the right to sue to the class of plaintiffs specifically contemplated by Congress when it enacts a provision. *First Nat'l Bank*, 522 U.S. at 498.

CarDon responds that the CRRA altered "who may be considered a proper defendant under Section 504" but "not who may be a proper plaintiff." As a practical matter, it did both. The CRRA expanded the scope of a covered entity's operations that could expose the entity to liability. After the CRRA was passed, a plaintiff who had not been able to sue

---

[3] Although district courts in the Seventh Circuit continue to cite *Simpson*, we have done so in only five decisions. Four of those decisions predated the CRRA. The last time we invoked *Simpson*, in *Ahern v. Board of Education*, 133 F.3d 975, 977 (7th Cir. 1998), it was for the proposition that authority under Title VI to remediate employment practices is not solely limited to circumstances "where a primary objective of the Federal financial assistance is to provide employment."

under section 504 because he was not an intended beneficiary of the specific program or activity receiving federal financial assistance now could sue. As a consequence of allowing more plaintiffs to bring claims against a covered entity, the covered entity would be a defendant in more discrimination suits. But Congress's primary motive in passing the CRRA was to extend a cause of action to additional individuals. And Congress did so by relieving a would-be plaintiff from establishing his direct connection to the part of a covered entity's operations receiving federal financial assistance. By expanding the class of plaintiffs that could sue an entity under section 504, the CRRA overturned *Simpson*'s zone-of-interests interpretation.

## III. Conclusion

We do not decide whether T.S.'s allegations against CarDon constitute prohibited discrimination under section 1557 of the ACA on the ground of disability. The merits of that claim will be addressed by the district court in due course, and we express no opinion on the question. But we conclude that T.S. has plausibly alleged an interest that comes within the zone of interests section 1557 seeks to protect. The district court correctly determined that T.S. is a permissible plaintiff against CarDon and that his suit may continue on that basis.

AFFIRMED